UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X

UNITED STATES OF AMERICA,


      -against-

                             15-Cr-333 (LTS)

ANDREI TYURIN,

         Defendant.
--------------------------------------------------------X




## ANDREI TYURIN'S SENTENCING SUBMISSION








Florian Miedel
MIEDEL & MYSLIWIEC LLP
80 Broad Street, Suite 1900
New York, New York 10004
(212) 616-3042
fm@fmamlaw.com

November 5, 2020

I.      **Introduction**

Andrei Tyurin, a 37-year old man with no criminal record of any kind, is the father of a three-year old daughter.  A Russian citizen, he has spent his entire life in and around Moscow, where both his wife and daughter, as well as his parents, continue to live.  Although convicted of sophisticated hacking crimes, Mr. Tyurin was, in fact, a mediocre student.  He failed his university entrance exams and was forced to attend a technical college to study electrical engineering, a subject in which he had no interest.  In 2002, however, during his last year of vocational school, Mr. Tyurin received his first computer, and a love affair began.  He was entranced by computing, and for the next several years, Mr. Tyurin spent all of his free time teaching himself the considerable computing expertise he now possesses.  *See* Letter to the Court from Andrei Tyurin, Exhibit A.

In 2007, that expertise caught the eye of Gery Shalon, an individual who was operating unlawful internet gambling casinos all over the world and was in dire need of someone whose hacking skills could provide him with the shortcuts he needed to continue to run his lucrative operations.  Someone who could spy on competitors, steal customer lists and databases, and generally serve as the eyes and ears for Shalon behind the scenes.

Andrei Tyurin fit the bill.  He had just left the army, lacked marketable skills, and wanted to use his self-taught computer knowledge rather than find a tedious entry level job in electrical engineering.  He was seduced not only by the money Shalon offered, but by the chance to feed his addiction to puzzle solving, studying and mastering new technologies, and the satisfaction of deciphering complex problems.  *See* Tyurin Letter, Exhibit A.  For the next eight years, Andrei served as Shalon's personal hacker – so to speak – providing Shalon access to domains that otherwise would have been unavailable.

Although Andrei willingly committed numerous hacking related crimes to support Shalon's schemes, he always drew the line at the actual stealing of money. Despite numerous opportunities and some prodding from Shalon, Andrei never misappropriated personal data in order to drain accounts or sell such information on the black market to identity thieves. Throughout his time with Shalon, Andrei knew that what he was doing was wrong, that it would all come crashing down at some point, and that he would have to pay the price for his decisions. And yet he could not extricate himself – the money, the intellectual challenges, the thrill – all kept him in place.

In 2015, Shalon and some of his co-conspirators were arrested in Israel. Safely ensconced in Russia, Andrei took the wake-up call of Shalon's arrest and its aftermath as an opportunity to try to switch gears. After a brief period of continuing to dabble in hacking activities, he began to explore ways in which he could use his hacking skills for positive endeavors. For close to two years prior to his own arrest in December 2017, Andrei worked as a "white hat" hacker, hired by companies to test their cyber security systems and fix potential vulnerabilities. During this time, too, Andrei married his girlfriend, Anna, and his beloved daughter was born. His legal employment and these family circumstances significantly altered his outlook on life. But in December 2017, Andrei traveled to the Republic of Georgia and was arrested.

The purpose of this sentencing memorandum is to place Mr. Tyurin's misconduct in context, explain the details of the circumstances of his offense, and convey to the Court the kind of person Andrei Tyurin is and has been outside of the parameters of his crime. It is in no way intended to minimize or defend. As we hope to demonstrate, Andrei Tyurin, as a human being is far more than his worst acts. He is the father of a young daughter he has not seen in nearly three years, whom he loves more than anything in the world, but who he worries is slowly

forgetting him.  He is a loving husband and son.  And, most importantly, he is a man who recognizes the harm he has wrought and has been doing what he can to make amends.  For the reasons set forth below, we respectfully urge the Court to impose a sentence significantly below the extraordinary and disproportional guideline range applicable in this case.  Such a sentence would be reasonable and sufficient to satisfy the aims of sentencing articulated in 18 U.S.C.  § 3553(a).

## II.  <u>Personal History and Characteristics</u>

Andrei Tyurin was born on May 8, 1983, in Moscow, and is the only child of Olga Nikolaevna and Yuri Vladislavovich Tyurin.  Mr. Tyurin's parents are now both retired and reside in Moscow.  As his parents write in a letter attached as Exhibit B, Andrei was, by all accounts, a thoughtful, engaged, and athletic young boy.  "In the beginning he went to a kindergarten where he had a lot of friends and [a] very good relationship with his teachers. [...] Andrei learned to read very early.  [...] He liked to play with younger children who would come to spend their summer in the village.  When one boy got lost in the forest, Andrei went with everybody else to look for him.  [...] He protected girls from hooligans and always tried to find peaceful resolutions." Exhibit B.

In the mid-1990s, as Russia slowly and painfully transitioned from its Soviet state-controlled economy to a free market system, hyperinflation became a major problem.  As the years wore on, the life savings of many Russians, including those of Mr. Tyurin's parents, evaporated.  With a new generation of Russian oligarchs rising to power, middle-class families like Mr. Tyurin's experienced some of the worst of the consequences.  Mr. Tyurin characterizes his family's economic situation post-1991 as decidedly below middle-class.  The family had enough to eat, but even modest luxuries were beyond its reach.

A friend of Mr. Tyurin's, Ivan Semko, recalls Andrei's reaction to that difficult period in a letter attached hereto as Exhibit C. "Andrei has always been a good friend. He always helped and came through when I needed him. Andrei has always been a kind, honest, and responsible man. Often, I saw Andrei giving an interest free loan when somebody asked him for it and he would even, on his own, offer [to] help if he felt that a person is too embarrassed to ask for help but is in a difficult situation.. Despite the fact that he grew up in the 90s, when after the fall of the Soviet Union street crime went through the roof, he did not become a burglar or a drug dealer. On the contrary, he graduated college, served in the army, and after that worked. Andrei has a very strong character. He was able to stop smoking. He almost never drank. He did sports. A few years ago, he got married. He has a daughter now who he loves very much." Exhibit C.

Following graduation from high school in 1998, Mr. Tyurin applied to university but failed his entrance exams and was ultimately forced to attend a vocational college, the Moscow State College of Electromechanics and Information Technology, studying electrical engineering. In 2002, Andrei Tyurin obtained his first computer. He was immediately entranced and began teaching himself. Assisted by useful character traits, such as patience and exceptional concentration, he slowly developed an expertise. As a result, he spent all of his free time teaching himself computer skills, frequently neglecting his studies. Nevertheless, he graduated with a degree in electrical engineering in 2003 and shortly thereafter was conscripted into the Russian Army. Even during his military service, however, when he was on leave or had free time, he spent most of it engaging in the complexities of computing.

Spurred by a love of problem solving and the exciting challenges of figuring out puzzles, he taught himself how to hack – how to penetrate cyber security systems – primarily to see if he could. By 2007, Mr. Tyurin had gained enough expertise and skills that he began to

be recognized in online forums as someone who was skillful and could identify weaknesses in internet security.  Upon the completion of his military service in 2008, he tried to find work in computer programming, but his lack of formal education or IT diplomas kept him from being considered for the kind of employment he was seeking.  He was not interested in pursuing work in electrical engineering, despite his study in the field.  It was at this moment in time when Gery Shalon, his co-conspirator, found him in an online chat room and offered him an opportunity to make money by hacking.

In 2012, Mr. Tyurin moved out of his parents' apartment in Moscow and into an apartment of his own.  In that same year, he met his future wife, Anna Nikolaevna, who was living in St.  Petersburg at the time.  As Ms.  Tyurina writes in a letter attached as Exhibit D, "On weekends Andrey was coming to see me.  He courted me beautifully.  Every time we met, he brought flowers and gifts.  […] We went on a trip to Cuba, to Lake Baikal, to Crimea.  […] During one of our trips, we learned that we were going to have a baby and that explained why I was not feeling well.  Andrey was very kind to me.  He was fulfilling all my requests.  I knew he would be a wonderful father.  After we found out that I was pregnant, we decided to get married.  […] But a week before the scheduled date I became seriously ill and was hospitalized for almost a month.  Andrey was very supportive of me during that period.  He supported my mother by calling her and making sure that she would not worry too much.  He had to cross the entire city to get to me.  He would bring me my personal items and sweets, but he was not even allowed to see me.  […] As I expected, he turned out to be a very good father.  Exhibit D.

In 2015, Andrei and Anna were married, and in 2016 they welcomed their first daughter, ███████████████.  *See* Exhibit E, Photograph of Anna and ███.  Before his arrest, Andrei was a model first-time father: he accompanied Anna on every visit to the pediatrician, he took turns staying up at night with ███, and did everything in his power to

make motherhood easy on his wife.  As Anna writes, "Together we chose a crib, a stroller, went to the store for children's clothes.  [...] At night, when the child was crying and did not sleep, Andrey would carry her in his arms and by doing that he was giving me a chance to rest.  All the difficulties associated with infancy we overcame together.  [...] When our daughter grew up a bit, Andrey taught her to walk, played a lot of games with her, helping the child's development, read[ing] children's books.  Sometimes, all of us went out to the park for a walk, played ball with the child or just fooled around." Exhibit D.  Ms.  Tyurina also details the close relationship between Andrei and her mother, which in Russian culture (even more so than in American culture) is an indication of a very healthy marriage.  *See id.*

Since Mr. Tyurin's arrest and parole into the United States, which was his first ever entry into this country, his daughter has grown up considerably, and her father's absence has been hard for everyone.  As Anna writes, "Our daughter noticeably grew up during Andrey's absence and it is very sad that he did not hear her first clear words.  Occasionally he hears her over the phone, but cannot see how she learned to run and dance.  And our daughter misses her dad very much and often asks when her dad will be coming back and why he has been out for so long.  [...] Now our daughter is going through a difficult period.  She is three and a half years old now.  She is developing her personality.  She has communication problems with peers.  We work with a psychologist, and the psychologist says that one of the reasons is that dad is far away.  Andrey is very worried.  When possible, he calls twice a day to find out how his daughter is doing.  She gets ill very often and then cannot attend kindergarten.  Because of that I cannot go to work, and without Andrey we have no means of supporting ourselves."  *Id.*

There have also been two important deaths in Mr. Tyurin's family since his arrest: his father's sister died unexpectedly, and his mother's brother died of heart disease.  As a result of these deaths and their son's incarceration, Ms. Tyurina reports that Andrei's aging parents are

far more depressed than usual.  Andrei's return to the fold would be an unimaginable help to all the members of his small but very tight-knit and loving family.

### III.   <u>Offense Conduct</u>

There is no question that Andrei Tyurin participated in a vast criminal conspiracy orchestrated by his co-defendant Gery Shalon.  In describing and discussing his criminal conduct, I in no way wish to mitigate or downplay the seriousness of his crimes.  Mr. Tyurin's hacking activities helped Shalon and his compatriots garner hundreds of millions of dollars through illegal means.  But in light of the flashy headlines and at times near hysterical news coverage about Mr. Tyurin's cyber intrusions, it is important to be clear about what Mr. Tyurin did and, more importantly, what he did not do.

In the simplest terms, it must be understood that by breaking into databases of financial institutions and other companies, Mr. Tyurin did not steal people's money.  He did not procure and misuse account numbers, or credit card information, that was then monetized on the black market and used to sluice funds out of people's accounts.  He did not withdraw money out of accounts, or transfer funds, or in any other way compromise the financial holdings of customers at the institutions he hacked.  He unlawfully obtained names, phone numbers, addresses, and email addresses of millions of people so that those people could later be spammed or approached with Shalon's pump and dump schemes.  This sets him apart from many other hackers who broke into the financial accounts of regular people in order to steal their money.

As noted above, Andrei Tyurin met Gery Shalon in 2007 on an internet forum.  Shalon was seeking webmasters who could assist in bringing new gamblers to Shalon's online gambling casinos.  In 2008, they met in person in Moscow, and a professional association was born.  Over the next 7 years, Mr. Tyurin served as Gery Shalon's personal hacker, obtaining, at Shalon's direction, information unlawfully that Shalon could not obtain legitimately.

8

### A. *Securities Fraud*

One of Shalon's illegal activities involved fraudulent stock sales known as "pump and dumps." Shalon and his co-conspirators acquired stocks of certain publicly traded companies, artificially inflated the stock price and trading volume by engaging in massive marketing campaigns to induce others to buy the stocks, then sold all their shares in a coordinated fashion, causing the stock price to drop and leaving other investors holding the bag. In order to perpetrate this stock manipulation scheme, Shalon needed large databases of potential investors to target with spam and other types of electronic marketing. Shalon figured that customers of large financial institutions, or subscribers to the Wall Street Journal, might be interested in such stock ventures, and therefore enlisted Mr. Tyurin to try to break into such institutions to steal identifying information, such as email addresses and phone numbers, of potential victims. *See* PSR at ¶35. Compared to other parts of Shalon's criminal operation, these pump and dump schemes netted Shalon and his co-conspirators a relatively modest amount, approximately $3.5 million. *See* Exhibit F, SEC Complaint against Shalon et al, at ¶¶ 24-59.

The largest and most splashy of these cyber intrusions was the 2014 hack of JP Morgan Chase, where, at Shalon's direction, Mr. Tyurin managed to gain access to the personal identifying information of approximately 83 million Chase customers. The breach was first revealed in August 2014 and confirmed by Chase in a disclosure form to the SEC in which the bank asserted that while user contact information such as names, addresses, phone numbers, and email addresses had been compromised, there was no evidence that account information for these customers was accessed. *See* Exhibit G, Chase 8-K form. Indeed, as reported in the press, "Chase declined to offer free credit monitoring or identity theft protection services to customers whose data was stolen, since no financial or account information was compromised." https://www.bankinfosecurity.com/chase-breach-affects-76-million-households-a-7395. As it

turned out, Chase discovered the intrusion before Mr. Tyurin could download the entire database, and it was Mr. Tyurin's understanding that Shalon never used the database to target Chase customers.

Chase Bank was one of the last financial institutions that Mr. Tyurin breached as part of Shalon's stock fraud scheme.  As set forth in the PSR, prior to Chase, Mr. Tyurin successfully gained access into several other financial sector firms (and the Wall Street Journal), downloading customer databases to provide Shalon with a list of people to send marketing materials to.  *See* PSR at ¶¶ 35-39.  The intrusions into these companies were all similar – Mr. Tyurin obtained customer personal identifying information, but did not attempt to transfer or steal funds.[1]

As misguided as his thinking may appear, Andrey Tyurin drew a hard line between stealing customers' identifying information and stealing their money.  He believed that illegally obtaining email addresses and phone numbers, while illegal, was more akin to the common practice by marketers of purchasing customer databases from large corporations, rather than identity theft, and certainly far less morally abhorrent than stealing people's money.  There were times during their criminal relationship when Gery Shalon suggested that Mr. Tyurin

---

[1] *See also Duqum v. Scottrade, Inc.*, 2016 WL 3683001, at *4 (E.D. Mo. July 12, 2016), *aff'd sub nom. Kuhns v. Scottrade, Inc.*, 868 F.3d 711 (8th Cir. 2017) (dismissing plaintiffs' lawsuit against Scottrade for allowing Mr. Tyurin to gain access and obtain customer data: "Plaintiffs do not allege any of the PII stolen in the breach has been used to commit any identity theft, fraud, or any other act that has resulted in harm to any plaintiff.  Nor do Plaintiffs allege any facts that suggest that the hackers intend to commit identity theft, fraud, or any other act that would result in harm to any plaintiff.  Thus, as in the above cases, the Court cannot determine whether Plaintiffs will suffer harm in the future without engaging in considerable speculation about the hackers' possible intentions and future actions.  Plaintiffs will suffer harm only *if* the hackers actually intend to use Plaintiffs' PII to commit identity theft, fraud, or some other act that might harm Plaintiffs; *if* the hackers attempt to use the PII to commit such identity theft, fraud, or other act; *if* they actually succeed in doing so; and *if* the identity theft, fraud, or other act causes harm to Plaintiffs.  In light of the uncertainty over whether any of these events will occur, the Court cannot find that Plaintiffs face any harm that is "certainly impending." This conclusion is strengthened by the fact that more than two years have passed since the original data breach without a single alleged instance of identity theft or fraud involving any of Defendant's customers.).

cross the line he had drawn for himself and monetize the account information he could have

stolen, but Mr. Tyurin never did.  Unlike other hackers who breached major financial

institutions and stole money, account numbers, or credit card information in order to deplete

customers' accounts,[2] Mr. Tyurin could not bring himself to do so.

### B.  Gambling and Credit Card Processing

The cyber intrusions into major financial institutions is the sensational part of this case;

however, it represents only a small portion of the losses attributable to Mr. Tyurin.[3]  Indeed, it

was Mr. Tyurin's assistance with Gery Shalon's illegal gambling empire that has driven the

"loss" calculation, and therefore the sentencing guidelines, to stratospheric heights.  As set

forth in the PSR, Shalon operated multiple illegal online gambling casinos based in locations

outside of the United States.  *See* PSR at ¶¶ 41-42.  Online gambling was unlawful in the

United States, but many U.S. - based gamblers nonetheless sought access to online casinos, and

American gamblers constituted a lucrative piece of the market.  Shalon had several competitors

in the online gaming industry, and he decided to use Mr. Tyurin to try to lure away his

---

[2] One such hacker, Vladimir Drinkman, extradited to the United States in 2015, obtained over 160 million credit card numbers and corresponding personal identification information through hacks into NASDAQ, 7-Eleven, Carrefour, JCP, Hannaford, Heartland, Wet Seal, Commidea, Dexia, JetBlue, Dow Jones, Euronet, Visa Jordan, Global Payment, Diners Singapore, and others, allowing him and his co-conspirators to steal hundreds of millions of dollars from individuals and banking institutions. Drinkman was sentenced to 12 years in prison.  *See* Exhibit H, DOJ Press release, 2/15/18.  Another, Ercan Findikoglu, was one of the masterminds behind three cyberattacks between 2011 and 2013 that inflicted more than $55 million in losses on the global financial system.  Findikoglu hacked into banks, increased the spending limits on customers' debit cards, then provided the account information to co-conspirators who transferred the information onto blank debit cards, who then used "cashing crews" to withdraw cash from ATM's all around the world, often depleting the accounts of bank customers.  *See United States v.  Findikoglu,* 13-Cr-440 (KAM) (EDNY), Govt.  Sentencing Submission, ECF No.  35.  Findikoglu, who had a prior conviction in Turkey for similar conduct, was sentenced by Judge Matsumoto to 96 months' imprisonment.  *Id.*  at ECF No.  37.

[3] As stated in the SEC complaint, Shalon's security fraud scheme seems to have netted approximately $3.5 million in profits.  The larger related loss is derived from efforts by JP Morgan Chase and other financial institutions to conduct forensic investigations, repair the vulnerabilities in their online security, and the assistance to law enforcement.

competitors' customers.  He directed Mr. Tyurin to hack into the systems of these other gaming sites and obtain their customer databases.  Shalon then bombarded those customers with electronic advertising and marketing in the hopes of enticing them to his casinos.

To aid in the smooth operation of his gambling empire, Shalon also owned and operated illegal multinational payment processing systems to process the credit and debit card payments made by his customers – especially those located in the United States.  *See* PSR at ¶¶ 43-45.[4] Legitimate processing companies refused, in accordance with U.S. law, to process American credit and debit cards to pay for gambling expenses.  Shalon therefore had to find a way to allow U.S.-based gamblers to finance their gaming.  In this enterprise, Shalon continuously needed to stay one step ahead of detection of his criminal payment processing activity by U.S. banks and companies that were hired by credit card issuers to assess merchant risk and compliance.  Failure to comply with these rules could result in massive fines levied on merchants by the credit card companies.  As a result, Shalon directed Mr. Tyurin to hack into the primary company in charge of determining compliance to see whether the company was on to Shalon's scheme, and to determine which credit card transactions were launched by this company as undercover purchases of illicit goods designed to detect unlawful merchants.

Mr. Tyurin was able to maintain consistent access to this company's systems, which allowed Shalon and his co-conspirators to monitor its fraud detection efforts.  By having access to the internal workings of the company, Shalon and his co-conspirators could determine which credit and debit card numbers were being used to make undercover purchases of illicit goods as part of the company's efforts to audit and detect unlawful merchants.  The entire purpose of

---

[4] Shalon also used his processing companies to process other unlawful transactions, such as illegal payments to illegal pharmaceutical distributors and purveyors of malicious "anti-virus" computer malware.

these cyber intrusions was to allow Shalon to continue to earn millions with impunity from his illegal casinos and the percentage fees he obtained from credit card processing.

Andrei Tyurin was well aware of the reasons for these intrusions and willingly engaged in these hacks on Shalon's behalf.  In return, Shalon paid him monthly "commissions" from the income he derived from his casinos.  Still, while obviously illegal, it should be clear that the criminal conduct related to Shalon's casinos and credit card processing schemes, which constitutes the vast majority of "losses" attributable to Mr. Tyurin in this case, is not analogous to illegal proceeds derived from stealing, deceit, or fraud.  Shalon made vast amounts of money because gamblers from all around the world, including Americans who were legally prohibited from doing so, engaged in online gaming at Shalon's casinos.  Shalon, and by extension Tyurin, did not force these gamblers to participate, did not steal their money, and did not deceive them. Because laws stood in the way of their legal participation and their legal ability to fund their gambling, Shalon, with Tyurin's help, found unlawful ways for them to continue to do so. Clearly, that conduct is against the law and as such deserves condemnation and punishment. However, there remains a palpable difference in moral culpability between stealing money from unsuspecting victims and helping interested gamblers evade questionable laws[5] so that they can willingly spend their money in illegal casinos.

That distinction is recognized both in the statute which criminalizes violations of the Gambling Enforcement Act (31 U.S.C.  §§ 5363, 5366, mandating a sentence range of 0-5 years), and the corresponding sentencing guideline (USSG § 2E3.1, which assesses a maximum offense level of 12, with no cross reference incorporating gambling winnings or losses).  It has

---

[5] The laws against online gambling are what they are, and it is up to federal and state legislatures to change them if people are unhappy about them.  That said, casinos are legal in several states and on Native American land.  Every state operates officially sanctioned lotteries, and sports betting is authorized in many locations.  *See, e.g., https://www.forbes.com/sites/realspin/2013/06/25/its-time-for-the-federal-government-to-legalize-internet-gambling/#59fe6cd46c6a.*

also been recognized by courts sentencing defendants charged with massive gambling and related fraudulent credit card processing crimes.  For example, in *United States v. Tzvetkoff, et al*, 10-Cr-336 (LAK), a vast and greatly lucrative credit card processing fraud related to illegal online gambling, the most severe sentence (by far) imposed by Judge Kaplan was 3 years' imprisonment for Defendant Ira Rubin.  *See* 10-Cr-336, ECF No.  223.  Another enormous indictment in the Southern District, *United States v. Tokhtakhounov, et al*, 13-Cr-268 (JMF), charged numerous individuals with racketeering activities related largely to bookmaking and sports betting, but also extortion and money laundering.  The longest sentence (by far) imposed by Judge Furman was 5 years' imprisonment for one of the leaders of the enterprise. *See* 13-Cr-268, ECF No.  894.

Reference to these cases is made simply to demonstrate that prosecutions for illegal gambling offenses (and related credit card processing crimes) are materially different than those in which defendants defrauded and stole from individuals.  Unlike in those cases, the gambling and processing crimes of which Mr. Tyurin has been convicted resulted in no losses and involved no actual or identifiable victims.  Again, this is not an effort to downplay the seriousness of Mr. Tyurin's crimes.  They are serious in their own right.  We are, however, trying to contextualize those crimes and to show that they are of a different nature than the kinds of criminal hacking that is often seen and prosecuted in the federal courts.

## IV.  <u>Conditions of Confinement</u>

Mr. Tyurin was arrested in the Republic of Georgia on December 12, 2017.  From then until his extradition to New York on September 7, 2018, he was housed in Penitentiary Building #8 of the Ministry of Corrections and Probation of Georgia, in Tbilisi.  As outlined in the PSR at ¶29, the conditions of Mr. Tyurin's confinement at the prison in Tbilisi were

singularly horrific.  For nine excruciatingly long months, Mr. Tyurin remained in a cell "plagued with mold and infested with roaches and bedbugs."  He was permitted to shower only twice per week and was not given regular access to toilet paper.  On several occasions, he was provided with rotten food, and he was prohibited from standard and allowable contact, both in-person and by telephone, with his friends and family.

The nine months of confinement in that Georgian prison took a severe psychological toll on Mr. Tyurin.  He had just been arrested for the first time in his life.  He was unsure whether or when he would face charges in the U.S., as an extradition request from Russia was still pending.  He was subject to draconian limitations on fulfilling his basic human needs for food, cleanliness, and social contact.  Perhaps worst of all, he was staring into the abyss of a life-ruining amount of potential prison time in a country to which he had never traveled, whose language he did not speak, thousands of miles from his home and family.

Once Mr. Tyurin was extradited to New York, his detention continued to be difficult. Having no family or friends in the United States meant that he has had no visits from loved ones to ease his alienation and stress during the entirety of his incarceration.  This separation sets him apart from many of his fellow inmates.  Often, during legal meetings with me before the COVID-19 pandemic, he saw his fellow inmates laughing, hugging, and eating with their wives, parents, and children.  He saw the joy and comfort such interactions brought to the men he is jailed with and longed deeply for similar connections.  He has not seen his beloved four-year-old daughter since around the time of her first birthday -- her entire conscious lifetime. He has not seen his ailing parents in years, both of whom have lost siblings since his arrest. *See* Letter from Anna Tyurina, Exhibit D.  The isolation and separation from his closest family members has, understandably, worn him down.

These difficulties of Mr. Tyurin's confinement will continue.  For the period of time before he is deported back to Russia, he will continue to be incarcerated far away from his beloved wife and daughter.  He will have no visitors, not even the legal visits that until March broke up the solitude of his detention.  As a foreign national subject to deportation, he will not be eligible to serve his sentence in a camp, which would normally be available to non-violent, white collar offenders.  *See* https://www.bop.gov/policy/progstat/5100_008.pdf, at 50.  He will not be able to avail himself of early release into a half-way house.  *See* https://www.bop.gov/policy/progstat/7310_004.pdf, at 10-11.  He will not be able to obtain "earned time credits," a new feature of the First Step Act that allows individuals to earn credits by completing rehabilitative programming and engaging in "productive activities" like helping deliver programming to other prisoners.[6]

### A.  COVID-19

The difficulties inherent in being imprisoned in a foreign country have only been exacerbated by the horrific conditions Mr. Tyurin has been forced to endure at MDC Brooklyn as a result of the COVID-19 pandemic.  The MDC was the first BOP institution in the nation to have a documented case of COVID-19.  *See* Michael Balsamo, "1st fed inmate tests positive for coronavirus," *Associated Press* (March 21, 2020), available at https://apnews.com/ec49cc7f4d1b00bc5010dfb6d935e042.  Correctional staff and detainees alike at MDC have described inadequate personal protective equipment, insufficient sanitation, little to no effort at contact tracing, and symptomatic detainees left untested and uncared for. *See Chunn v.  Edge*, 20-Cv-1590 (RPK), _F.Supp.3d_, 20 WL 3055669, *13-*14 (June 9, 2020 E.D.N.Y.).  Judge Rachel Kovner, who oversaw the class action lawsuit against MDC related to

---

[6] Depending on a person's risk level, 15 days of credit can be earned for every 30 days of programming or productive activities.  These time credits can be redeemed for early transfer into a halfway house, home confinement, or supervised release.  Non-citizens with immigration detainers cannot redeem earned time credits.  *See* 18 U.S.C.  § 3632(d)(4).

its actions during the COVID-19 crisis, found that medical staff at MDC "take days or even weeks to respond to some sick-call requests reporting COVID-19 symptoms," even when those reports include "trouble breathing." *Id.*, at *17-*18. Judge Kovner further found that "from March 13 to early May MDC was neither isolating nor testing more than 80 percent of inmates who report[ed] symptoms of COVID-19." *Id.* at 19. And the number of COVID-19 cases at MDC has only continued to rise, even while the number of cases in New York City falls. On May 26, 2020, the MDC reported 6 positive inmates and 39 positive staff members; on October 15, 2020, those numbers had risen to 20 positive inmates and 44 positive staff members. *Compare* Letter of Wardens Licon-Vitale and Edge to Chief Judge Mauskopf (May 26, 2020), available at https://www.nyed.uscourts.gov/pub/bop/MDC_MCC_20200526_054048.pdf *with* Letter of Wardens Licon-Vitale and Edge to Chief Judge Mauskopf (October 15, 2020), available at https://www.nyed.uscourts.gov/pub/bop/MDC_MCC_20201103_035157.pdf.

Andrei Tyurin has been fortunate enough not to contract the virus, to his knowledge. However, one should not underestimate the psychological effects Mr. Tyurin and other MDC inmates felt as a result of fear as the virus swept through BOP facilities, including the MDC. Mr. Tyurin had no ability to control his own response to the pandemic. He could not decide for himself how vigilant to be about social distancing, scrubbing down his surroundings, wearing protective gear, and having contact with others. His personal response to dealing with a potentially deadly virus was entirely controlled by others – others who often did not seem to care much about the well-being of the inmates for whose safety and wellness they were responsible. This lack of agency undoubtedly affected Mr. Tyurin's own psychological well-being.

### B.  Full Lockdown

The virus itself is not the only adversity encountered by inmates behind the walls of the MDC.  The restrictions put in place by the MDC administration to prevent further spread of COVID-19 within the facility have been brutal.  There may be legitimate reasons for transforming a traditional prison experience into one usually reserved only for those inmates meriting further punishment.  But that does not diminish the fact that Mr. Tyurin's conditions of confinement have been extraordinarily harsh.  Along with his fellow inmates, Mr. Tyurin has been under a complete lockdown -- confined, with his cellmate, to a 6 by 10-foot cell -- since approximately March 20, 2020.  Between March 20 and May 18, Mr. Tyurin was allowed out of the cell for three one half-hour periods *per week* to shower and make phone calls.  Since May 18, that period of time has been increased to three hours a day -- but it means that Mr. Tyurin is still locked into his cell for 21 hours per day, every single day.  Since the middle of March, Mr. Tyurin has had no human contact with the outside world, other than guards.  For five months, he has endured what under normal times is reserved as the severest form of punishment within the MDC: day and night confinement to a small cell with a stranger.[7]

The media is rife with commentary about the adverse effects of sheltering in place on general states of happiness and mental health.  We are all, in one way or another, negatively affected by the restrictions and limitations on our lives since the onset of the pandemic.  But for most of us that can hardly compare to the life that Mr. Tyurin has led during the last seven months.  Not only has he been forced to endure a complete lockdown, he has also been forced to live with the feeling of utter lack of control over his health.  While the virus was raging inside

---

[7] At the MDC, even the punishment cells in the Special Housing Unit are usually occupied by two people.

BOP facilities and other prisons, all he could do was hope that MDC's measures were enough to protect him.

All this is to say that the conditions of Mr. Tyurin's confinement have not been easy, standard, or only slightly worse than normal.  From his detention at a Georgian facility that repeatedly violated his human rights to his housing at the MDC Brooklyn, a facility that continues to create risk of exposure to COVID-19 for inmates while simultaneously depriving them of what little freedom of body and mind they can expect under normal conditions, Mr. Tyurin has had an extraordinary detention experience.  As a result of this disparate treatment -- in addition to the unavoidable circumstances brought on by the fact that he is imprisoned in a foreign country -- Andrei Tyurin will serve harder time, will suffer greater punishment, than similarly situated American defendants. Courts frequently consider the conditions of confinement endured by defendants in foreign jails awaiting extradition because of the harsh nature of the imprisonment, including the equivalent of solitary confinement.  I simply urge the Court to take these extraordinary circumstances into account in determining a just and fair sentence.

## V.   The Advisory Guideline Range Does Not Adequately Measure Culpability In This Case

The advisory guideline range in this case is calculated using the general fraud guideline (U.S.S.G.  § 2B1.1).  For Mr. Tyurin, this results in a total offense level of 36, with an imprisonment range of 188-235 months.  *See* PSR at ¶¶ 80, 117.  This range overstates the nature of the offense and the presumptive need for deterrence and does not support any of the other non-retributive purposes of sentencing under § 3553(a).

The sentencing guidelines are one factor under 18 U.S.C.  § 3553(a) that the Court must consider in determining a reasonable sentence.  Yet it is no secret that the fraud guideline at

U.S.S.G. § 2B1.1 has been under assault for some time. The guideline places an unwarranted emphasis on loss that has no empirical basis, which frequently overstates the severity of the offense. *See United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016) ("Where the Commission has assigned a rather low base offense level to a crime and then increased it significantly by a loss enhancement, that combination of circumstances entitles a sentencing judge to consider a non-Guidelines sentence.").[8] *See also United States v. Faibish*, No. 12-CR-265 ENV, 2015 WL 4637013, at *2 (E.D.N.Y. Aug. 3, 2015) ("The loss table is but one example of the seemingly mindless acceleration of penalties for economic crimes incorporated in the current Sentencing Guidelines regime."); *United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012), *aff'd*, 747 F.3d 111 (2d Cir. 2014) ("[I]n implementing the Congressional mandate, the Sentencing Commission chose to focus largely on a single factor as the basis for enhanced punishment: the amount of monetary loss or gain occasioned by the offense. By making a Guidelines sentence turn, for all practical purposes, on this single factor, the Sentencing Commission effectively ignored the statutory requirement that federal sentencing take many factors into account, *see* 18 U.S.C. § 3553(a), and, by contrast, effectively guaranteed that many such sentences would be irrational on their face. . . . the numbers assigned by the Sentencing Commission to various sentencing factors appear to be more the product of speculation, whim, or abstract number-crunching than of any rigorous

---

[8] In *Algahaim,* the Second Circuit notably took issue with the very basis of the fraud guideline even after implementation of the 2015 economic crime amendments, explaining: "The Commission could have approached monetary offenses quite differently. For example, it could have started the Guidelines calculation for fraud offenses by selecting a base level that realistically reflected the seriousness of a typical fraud offense and then permitted adjustments up or down to reflect especially large or small amounts of loss. Instead the Commission valued fraud (and theft and embezzlement) at level six, which translates in criminal history category I to a sentence as low as probation, and then let the amount of loss, finely calibrated into sixteen categories, become the principal determinant of the adjusted offense level and hence the corresponding sentencing range. This approach, unknown to other sentencing systems, was one the Commission was entitled to take, but its unusualness is a circumstance that a sentencing court is entitled to consider." 842 F.3d at 800 (citations omitted).

methodology—thus maximizing the risk of injustice.").[9] As a result, and not surprisingly, federal judges in New York routinely impose significantly below-guideline variances in white collar cases.

This Court is, of course, well aware of the problems and inequities associated with the fraud guidelines.  In 2014, the Court presided over the so-called Madoff trial, a trial of five individuals who worked closely with Bernard Madoff in perpetrating the largest financial fraud in history.  *See United States v. O'Hara et al,* 10-Cr-228 (LTS).  The losses suffered by investors in Madoff Industries are well known to have amounted to tens of billions of dollars. Some of the finest legal talent in New York, if not the country, represented the five defendants who proceeded to trial.  After they were convicted and it came to sentencing, hundreds of pages of sentencing briefs were submitted to the Court, a significant percentage of which was devoted to demonstrating that the guidelines, which in that case called for life sentences, were grotesquely disproportional to the defendants' culpability.

Ultimately, the most serious sentence the Court imposed was 10 years for Daniel Bonventre, and less for the other defendants.  *See* 10-Cr-228, at ECF Nos.  1223, 1225, 1232, 1233, 1243.  In so doing, the Court recognized that the sentencing guidelines in a vast financial fraud case like the Madoff matter were particularly unhelpful in assisting the Court in determining the proper sentence.  The Court carefully weighed the § 3553(a) factors and

---

[9] Indeed, Judge Jon Newman famously wrote in his objection to the enactment of the guidelines: "My first point challenges a basic assumption that underlies the entire proposal – the idea that every increment of harm that can possibly be measured should be reflected in an increment of additional punishment.  I seriously doubt that there is moral validity to this idea." Irene Nagel, *Structuring Sentencing Discretion: The New Federal Sentencing Guidelines*, 80 J.  CRIM.  L.  & CRIMINOLOGY 883, 916, 918, 921 & n.21 (1990) (quoting from Judge Newman's letter to the Sentencing Commission). *See also* Hon.  Mark W.  Bennet, Prof.  Justin D.  Levinson, and Prof.  Koichi Hioki, "Judging Federal White-Collar Fraud Sentencing: An Empirical Study Revealing the Need for Further Reform," *Iowa Law Review*, Vol.  102 (2017) at 982 ("We, like most of the groups and individuals that provided comments or testimony to the Commission, are also troubled by the guidelines' overreliance on the amount of the loss.").

concluded that the sentences of 10 years or less were reasonable and just, even though the defendants had not accepted responsibility for their complicity in Madoff's crimes and despite the massive magnitude of the losses suffered by individual investors.

Here, too, the stratospheric guidelines provide little proper guidance to the Court.  Mr. Tyurin's base offense level is increased by 22 points because he is held responsible for losses between $25 million and $65 million.  *See* PSR at ¶ 58.  But as described above, that loss calculation does not adequately encompass Mr. Tyurin's culpability.  During the eight years of his association with Gery Shalon, Mr. Tyurin believes that he earned about $5 million.  Much of the money that Shalon promised him – the government estimates that he was paid about $19 million – was not, in fact, paid to him but was "re-invested" in Shalon's casino schemes, with promises of future payouts that never occurred.  Most of the money Mr. Tyurin did earn came from Shalon's illegal online gambling profits, which are not losses in the typical sense.  No one was deprived of money illegally.  Online gamblers lost money the way gamblers always lose money – they just did so in forums that were not legally authorized.

Moreover, as noted above, Shalon's pump and dump scheme netted a total of perhaps $3.5 million, a small percentage of the overall loss.  While Mr. Tyurin's hacks into financial institutions were an integral part of that scheme, he himself did not participate in the solicitation of potential investors, he did not engage in electronic marketing or make pitches for purchases of dubious stocks.  His role was to procure lists of potential targets for electronic marketing – what was eventually done with those lists did not involve him.

Once again, we are not trying to downplay Mr. Tyurin's culpability.  The purpose of this section is simply to illustrate that the §2B1.1 sentencing guideline is ill equipped to offer meaningful assistance to the Court in this case, and the Court should give it little consideration as it weighs the sentencing factors of 18 U.S.C.  § 3553(a).

## VI.   Conclusion

Andrei Tyurin used his considerable talents and skills to commit crimes.  The fact that
he did so at the behest and direction of Gery Shalon is ultimately of little moment.  He knew
better; indeed, his conscience frequently reminded him of the bad decisions he was making.
Nonetheless, he rationalized his misconduct, tried to explain to himself that he was not
stealing, was not directly hurting people – in fact to some degree was just helping people do the
things they wanted to do anyway, such as illegally gambling or investing in speculative stock
schemes.  But, of course, these were just stories he needed to tell himself to continue to
participate in Shalon's criminal schemes.

Those rationalizations have ended.  Andrei Tyurin fully understands and appreciates
now just how serious his wrong turn was.  *See* Exhibit A, Tyurin Letter to the Court. He
understands that his talents and skills allowed Shalon to perpetrate his enormously profitable
schemes, and that his role – essentially that of an employee – was crucial to the success of the
criminal enterprise.  He also recognizes that his disastrous judgment in falling prey to the
temptations offered by Shalon – the money, the ability to use his skills, the opportunity to solve
puzzles – has led to a devastating personal loss.  Before 2016, Mr. Tyurin was primarily
concerned with himself and his then new wife.  But in 2016 he became a father, which
fundamentally changed his life outlook.  The excitement of hacking, of outwitting cybersecurity
systems, was no longer of utmost importance to him.  He thought, and cared about his little
family, about his wife and daughter.  It has been almost impossible for Mr. Tyurin to bear the
thought that his bad decisions have led to the loss of a relationship with his young daughter,
his absence in her life, his inability to be a father like he wants and needs to be.  He writes in his
letter to the Court: "And now I am terribly, terribly worried because we are separated and

almost do not communicate and it is all because of something I was doing before she was born. But I too feel uneasy and do not know anymore how to understand her and what to say to her. I have a feeling that I became a stranger to her and she feels shy when she hears me. But I hope that at some point I will be able to return to her and we will find common ground." Exhibit A.

In other words, Andrei Tyurin is already suffering the internal, emotional consequences of his behavior. But as discussed above, he has also suffered physically and psychically in extraordinary ways. He has been imprisoned for three years – much of that under conditions that should not be acceptable in a civilized society. He has endured this confinement for crimes that, while extensive and sophisticated, were not violent and did not cause individuals any harm.

Shalon's empire was vast, involving numerous co-conspirators. Six, who were charged in a separate indictment (15-Cr-769 (AJN)), operated Shalon's illegal bitcoin exchange, "coin.mx." *See* PSR at ¶31. The leader of that exchange was sentenced to 66 months for extensive financial fraud, while the rest of the defendants received lower sentences. *See* 15-Cr-769 ECF Nos. 632, 641, 657, 694, 715. Only one of Mr. Tyurin's co-defendants in the instant indictment has been sentenced. On October 22, 2020, the Court sentenced Ziv Orenstein to time served (constituting about 13 months of largely pre-extradition detention). Mr. Orenstein was a valuable cooperator, so he obviously received the benefit of a significant downward departure based on USSG § 5K1.1. The other two co-defendants, Gery Shalon and Joshua Aaron, have not yet been sentenced. It appears from publicly available sources, however, that neither remains detained.[10] If that is the case, no one in this case except Mr. Tyurin has remained incarcerated for any significant period of time, including Gery Shalon, the

---

[10] *See e.g.* https://www.financemagnates.com/forex/regulation/israeli-scammer-pay-403-million-us-authorities-following-sting-operation/#:~:text=The%20London%20Summit%202017%20is,of%20imprisonment%20in%20the%20US; The BOP's inmate locator shows Joshua Aaron released on June 22, 2018. *See* www.bop.gov.

undisputed mastermind of the entire criminal enterprise.  Even if there are other factors at play that would allow Shalon, Orenstein, and Aaron to escape significant sentences, factors not present for Mr. Tyurin, there is nevertheless something problematic about one participant in a vast conspiracy person facing astronomical guidelines, while the others find ways to mitigate their exposure.

Andrei Tyurin must accept the consequences of having walked down the wrong path, regardless of his motivations, regardless of the context.  He cannot change what he did and he cannot change the past, as much as he now wishes he could.  He can only control what is ahead. Mr. Tyurin's rehabilitation that began in 2016, his deep remorse and understanding of his wrongdoing, and his unparalleled love for his daughter all suggest that he can and will move forward and live a wholesome and productive life.  He committed a serious crime, but he has the tools and the will to fix what he can, and to go on to make a positive difference.  I respectfully urge the Court to allow him to do so as soon as possible.

Thank you for your consideration.

Respectfully Submitted,

/s/

Florian Miedel
MIEDEL & MYSLIWIEC LLP
80 Broad Street, Suite 1900
New York, New York 10004

*Attorney for Andrei Tyurin*

Cc:     AUSA Eun Young Choi (email)