# EXHIBIT A

I thank you for giving me the opportunity to address you personally on my behalf.

For many years I was a participant in criminal activity. And now I can only imagine how much harm from a financial point of view and especially from a moral point of view my actions have caused. What despair, horror and anger the individuals and clients of affected companies must have felt after it all happened. In connection with that I want to express my deepest remorse for the crimes committed by me.

I sincerely apologize to everybody who in one way or another became a victim. Also, I want to apologize to the entire society for having violating its norms and laws.

I also want to apologize to the members of the investigative teams and law representatives for committing illegal acts and, in particular, for complicating the investigation during certain period of time.

Unfortunately, my life did not work out the way I wanted or in the spirit of my upbringing.

After graduating from high school, I tried to get into a college that offered programming classes twice. But unfortunately, twice I did not pass the entrance exams. And I had no choice but to apply to those schools where the entrance requirements were not as high. So, that is how I ended up being accepted to the program of electrical engineering. I did it for only one reason – just to study somewhere, although my interests were somewhat different. It is possible that this subsequently prevented me from realizing my potentials legally in the information technology field. But when I was able to get my own computer and access to the internet, I, not having correct principals which I should have used as a beacon, began to study everything that was of interest to me. I began to study issues of information safety. Naturally, I did not have in mind hacking financial institutions. I just had a craving for research, a desire to solve complexed problems and discover something that had not been discovered yet, new horizons in standard technologies.

Despite the fact that with time I gained knowledge, I still did not have confidence in myself. I mean, that I would not be able to utilize what I learned. The biggest obstacle that I saw was the fact that every company before hiring a new employee required proof of specialized education, diplomas, etc. I had no chance to be hired without job experience.

And such, by showing cowardness, I had chosen a wrong path in life. After working for several years with Shalon, it became very difficult psychologically to withdraw from his "company".

Nevertheless, I never kid myself and I clearly understood that I was doing the wrong things. At some point the end to that would come. And eventually, which was very logical, the end came. And it took me to where I am right now. I also want to add that I was not proud of what I was doing. I could not admit to other people what I was involved in. Even now I am terribly ashamed of that. Especially before those who trusted in me and who now probably are very disappointed.

Shalon's arrest finally put everything in place. I also realized that my arrest might happen at any time as well. But it was slightly delayed.

Several months later I got married and then our beloved daughter was born. The child's birth has changed me. I can say that I became more responsible because now here was this tiny human being who depended on me and who lives with the consequences of my decisions, right ones or wrong ones. And now I am terribly, terribly worried because we are separated and almost do not communicate and it is all because of something I was doing before she was born. But I too feel uneasy and do not know anymore how to understand her and what to say to her. I have a feeling that I became a stranger to her and she feels shy

when she hears me. But I hope that at some point I will be able to return to her and we will find common ground.

I feel terrible guilt before my parents and my wife. I can only imagine how much they cried. I hope they will find in their hearts to eventually forgive me. Nevertheless, they have been showing tremendous support for me and I am awfully thankful to them for it. Especially to my beloved wife. Despite everything she did not get disappointed in me.

One of the government's functions is to protect the honest population from those who commit crimes. In turn, those who commit crimes need to understand that punishment for what they do is inevitable. Today, unfortunately, I am an example of it. In light of that I want to again express an admission of my guilt and my remorse.

I thank you again for taking time to read my letter and for giving me the opportunity to tell you about myself.

V1

1

Прежде всего я хочу выразить свое глубокое раскаяние за совершенные мной преступления.

На протяжении многих лет я был участником преступной деятельности. И могу только предположить на сколько сильный вред принесли мои действия в материальном и особенно в моральном плане. В связи с этим я выражаю свое абсолютное раскаяние за совершенные мной действия как перед всеми жертвами преступлению - частными компаниями и их представителями и персонально перед людьми, кто так или иначе оказали пострадавшим, так и перед всем обществом чьи нормы я нарушил своими преступлениями.

• • •

К сожалению жизнь моя сложилась так, что после школы у меня не получилось поступить как я хотел учиться на программиста. И видимо это не дало мне возможности реализовать себя сразу в "мирном русле". За место этого я, когда у меня появился компьютер и интернет - под влиянием романтики "хакерства" и желания быстро заработать выбрал не верный путь. Я не считал и никогда не считал что я какой то особенный и талантливый, просто наверно я достаточно был усидчивый и сконцентрированный. И

2

После того когда я уже что-то научился у
меня всё равно не было уверенности что смогу
как-то реализовать себя легально, из за отсут-
ствия официального образования и дипломов в
IT сфере. Хотя после я и получил пару сер-
тификатов, знания и умения у меня были
уже узко специализированными. И как при-
менять их легально я не представлял, поскольку
область информационной безопасности была еще
не достаточно развита. После же когда я уже
много лет проработал с Шоломо думать всё
было психологически еще тяжелее. И стало
только представлять как и когда всё закончится.
~~Но несмотря на это~~
Но сейчас могу, уверен сказать что после
ареста Шолома и примерно через 9 месяцев
я наконец на 100% нашел применение своим
навыкам легально. Хоть и ~~это~~ продилось не
очень долго в связи с арестом.
  Также хочу сказать что примерно в это же
время у меня родилась моя любимая дочка. Ко-
нечно я очень себя виню это из за того чем
я занимался до её рождения она теперь лишена
моей заботы. Не смог на сколько я был хорошим
отцом находясь рядом с ней, но хочется верить
что она не совсем меня забудет за время моего
заключения. И как ето частичку меня она
~~себя~~ держит у себя в сердечке. К сожалению

сейчас я даже не разговариваю почти с ней, так видимо она отвыкла уже от меня и наверное стесняется. Ну из-за уже из за длительной разлуки не знаю что говорить и как её понимать, что она думает. Конечно по мимо прочего я ещё очень виноват перед моими родителями и женой. Сколько я доставил им слез я могу только догадыватся. Не смотря на это и к счастью, я получаю большую поддержку со стороны моей семьи, в чем я им благодарен.

# EXHIBIT B

We, Yury and Olga, are the mother and the father of Andrei Tyurin. Our son was the only child in our family. We brought him up as a responsive, polite and kind-hearted boy.

In the beginning  he went to a kindergarten where he had a lot of friends and he had a very good relationship with his teachers. He liked playing with tin soldiers, sledding in winter and cycling in summer. Andrei learned to read very early. His favorite books were: "The Adventures of Dunno" and  "The Wizard of Oz". Summers Andrei spent in the country with the grandma and the grandpa. He was helping them with various chores, carrying buckets of water from the well, chopping wood. He liked very much to go fishing and to pick mushrooms. He liked to play with younger children who would come to spend their summer in the village. When one boy got lost in the forest, Andrei went with everybody else to look for him.

In school Andrei studied very well, never missed classes. He had a lot of friends with whom he played soccer in the building's yard and with whom he celebrated their birthdays. He always helped his friends, helped them with their homework. He protected girls from hooligans and always tried to find peaceful resolutions.

When Andrei started his own family, when his child was born, he became a very caring and loving husband and father. He tries to spend as much time as possible with his family and with us. He was able to create a solid family where peace and calmness are king. We feel his support and protection.

When we heard that he was arrested – that was a tremendous shock to us. We cannot believe that our son, such a positive and correct-in-everything person, was able to commit illegal actions.

Your Honor, we are asking you to show mercy to our child.

Мы – мама и папа Андрея Тюрина- Юрий и Ольга. Сын у нас рос единственным ребенком в полной семье. Мы воспитывали его отзывчивым, вежливым и добрым мальчиком. Сначала он ходил в детский сад, где у него было много друзей, хорошие отношения с воспитателями. Любил играть с солдатиками, кататься зимой на санках, а летом на велосипеде. Андрей рано научился читать. Его любимыми книгами были « Приключения незнайки» и «Волшебник изумрудного города». Лето сын проводил у бабушки с дедушкой в деревне. Он помогал по хозяйству, носил воду из колодца, рубил дрова, с удовольствием ходил на рыбалку и за грибами. Он любил играть с младшими детьми, которые на лето приезжали в деревню. А когда один мальчик заблудился в лесу, Андрей вместе со всеми помогал его искать.

В школе Андрей прилежно учился, не прогуливал. У него было много друзей, с которыми он играл во дворе в футбол, они вместе праздновали дни рождения. Он всегда приходил друзьям на помощь, помогал с уроками. Защищал девочек от хулиганов, старался мирно загладить все конфликты. Когда у Андрея появилась своя семья, родился ребенок, он стал заботливым, любящим  мужем и отцом. Он старается много времени проводить со своей семьей, с нами. У него получилось создать крепкую семью, где царит мир и покой, мы чувствуем его поддержку и защиту.

Когда мы узнали о его задержании- для нас это был  большой удар. Мы не можем поверить в то, что наш сын , положительный и правильный во всем , мог совершить противоправные действия. Ваша Честь, мы просим вас о снисхождении для нашего ребенка.

# EXHIBIT C

Honorable Laura Swain,

My name is Ivan Semko. I was born and grew up in the City of Moscow in Russia, where I still reside and work. I am a very close friend of Andrei Tyurin. I have known him for almost twenty years. We met in college and became friends during our senior year.

Andrei has always been a good friend. He always helped and came through when I needed him. Andrei has always been a good-hearted, honest and responsible person. Often, I saw Andrei giving an interest free loan when somebody asked him for it and he would even, on his own, offer help if he felt that a person is too embarrassed to ask for help but is in a difficult situation.

Despite the fact that he grew up in the 90s, when after the fall of the Soviet Union street crime went through the roof, he did not become a burglar or a drug dealer. On the contrary, he graduated college, served in the army and after that worked. Andrei has a very strong character. He was able to stop smoking. He almost never drank. He did sports. A few years ago, he got married. He has a daughter now who he loves very much.

When I heard from the news that Andrei was arrested and he has to answer to the court for very serious crimes, I was terribly shocked, surprised, worried and concerned. I don't know if a terrible mistake had happened. Maybe he was deceived, misled or if he had really committed some illegal actions, but, Your Honor, I believe that Andrei feels very remorseful about the mistakes he made in the past. I am very sure that he is very remorseful about the events that put him in the situation where he is right now. I am very sure that he has learned his lesson and will never do anything that might put him in such a sad situation again.

I hope that the above described information will somehow help Andrei to again see his wife, his daughter, his parents, and, of course, his friends.

Honorable Judge, thank you very much for the time you have spent reading this letter.


Respectfully,

Ivan Semko

Достопочтенный Лора Суэйн

Меня зовут Иван Семко, я родился и вырос в городе Москва, Россия, и до сих пор живу тут и работаю. Я близкий друг Андрея Тюрина, я знаю его уже примерно 20 лет, познакомился с ним во время учёбы в колледже, на последних курсах сдружился с ним.

Андрей всегда был хорошим другом, в случае необходимости всегда помогал и выручал. Андрей всегда был добрым, честным и ответственным человеком. Я не раз видел, как он давал денег в долг беспроцентно, если его об этом просили, и даже сам предлагал помощь, когда считал, что человек стесняется спросить, но при этом находится в затруднительном положении.

Несмотря на то, что он рос в 90-е годы, когда после развала СССР, на улицах процветала преступность, он не стал грабителем или наркоманом. Наоборот, он отучился в колледже, отслужил в армии, работал. У Андрея сильный характер, ему удалось бросить курить, он почти не пил, занимался спортом. Несколько лет назад он женился, и у него родилась дочь, которых он очень любит.

Когда я узнал из новостей, что Андрея арестовали, и что он должен предстать перед судом по обвинению в очень серьезных преступлениях. Я был очень сильно потрясен, удивлен, обеспокоен и озабочен. Я не знаю, произошла ли просто какая-то страшная ошибка, может он был обманут или введен в заблуждение или он все же совершил какие-то противоправные действия, но Ваша Честь, я верю, что Андрей очень сожалеет об ошибках, которые он мог совершить в прошлом. Я уверен, что он сожалеет о событиях, которые привели его к той ситуации, в которой он сейчас оказался. Я уверен, что он примет во внимание урок и никогда более не совершит действий, которые могли бы вызвать такую печальную ситуацию.

Я надеюсь, что приведенная выше информация каким-то образом поможет семье Андрея, его жене, его дочери, его родителям, не говоря уже о его друзьях, снова увидеть его. Большое спасибо за то время, которое вы потратили на чтение этого письма, достопочтенный судья.

С уважением,

Иван Семко

# EXHIBIT D

To Honorable Laura Swain,

United States District Judge
Southern District of New York

Good day, Your Honor.

My name is Tyurina, Anna, and I am the wife of Tyurin, Andrey. In this letter I would like to tell you about my husband and about our family.

At the time when we met, we lived in different cities. He lived in Moscow, I lived in St. Petersburg. On weekends Andrey was coming to see me. He courted me beautifully. Every time we met, he brought flowers and gifts. In St. Petersburg we went on long walks, visited the Hermitage, took a trip to Petergof (Petrodvorets with fountains). We went on a trip to Cuba, to Lake Baikal, to Crimea. All this was before the birth of our child. While traveling Andrey did not like to stay in one place and we went on tours where we learned about local history. During one of our trips, we learned that we were going to have a baby and that explained why I was not feeling well. Andrey was very kind to me. He was fulfilling all my requests. I knew that he would be a wonderful father. After we found out that I was pregnant, we decided to get married. We were not planning a fancy wedding. We just wanted to have a wedding for the two of us. We bought identical rings, wedding clothes and hired a photographer for a photo shoot. But a week before the scheduled date I became seriously ill and was hospitalized for almost a month. Andrey was very supportive of me during that period.   He supported my mother by calling her and making sure that she would not worry too much. He had to cross the entire city to get to me. He would bring me my personal items and sweets, but he was not even allowed to see me. In the end, after all those unfortunate events, we simply went to the city's Marriage Bureau and became husband and wife and after that we had a quiet family dinner with our parents. Andrey was happy to learn about my pregnancy. Together we were choosing a name for our daughter. He was with me when we did an ultrasound in 3D. Together we chose a crib, a stroller, went to the store for children's clothes. We decided that Andrey would be present at the birth. But the birth was not natural (cesarean section). Nevertheless, it did not stop us. During the surgery Andrey was in the preoperative room. After the baby was born, they put the baby in his arms and he carried her to the children's ward. So, it turned out that he was the first person who our daughter clearly saw. After that he stayed with me in the hospital room where I was recovering from anesthesia.
As I expected, he turned out to be a very good father. During the first year Andrey and I were going to the pediatrician every month and we always went together. At night, when the child was crying and did not sleep, Andrey would carry her in his arms and by doing that he was giving me a chance to rest. All the difficulties associated with infancy we overcame together.

/the end of page 1, initialed/

When our daughter grew up a bit, Andrey taught her to walk, played a lot of games with her, helping the child's development, read children's books. Sometimes, all of us went out to the park for a walk, played ball with the child or just fooled around. Our daughter noticeably grew up during Andrey's absence and it is very sad that he did not hear her first clear words. Occasionally he hears her over the phone, but cannot see how she learned to run and dance. And our daughter misses her dad very much and often asks when her dad will be coming back and why he has been out for so long. Andrey does not have many friends. I know some of them, but I never had close contact with them, because there is not much free time when one has a small child. Andrey sometimes met with them, spent some time with them. All my friends live in St. Petersburg, so we rarely see each other, but Andrey never minds if someone comes to visit us and enjoys talking to them. Andrey has a good and trusting relationship with my mother. We go to visit her

and Andrey is glad when my mother comes to see us. When my child and I went to the sea resort, Andrey insisted that my and his mother went with us. During Andrey's absence, two misfortunes took place in his parents' family. His father's sister died suddenly, and his mother's brother died of heart disease. Andrey's parents have been very depressed, and Andrey also happened to be in such a difficult situation. I support them as much as I can, but this does not replace their only son's support. About Andrey. I can say that he is a versatile person. He reads a lot, mainly history books, documentaries, fiction. He does amateur karate and regularly attends training. He leads a healthy lifestyle. The films he watches are mostly documentaries, historical and political. He loves "smart" movies, but also loves movies about Zombies. All our conversations at the present time are mainly about our daughter, about her achievements and failures. I consult with Andrey on matters of her upbringing. Now our daughter is going through a difficult period. She is three and a half years old now. She is developing her personality. She has communication problems with peers. We work with a psychologist, and the psychologist says that one of the reasons is that dad is far away. Andrey is very worried. When possible, he calls twice a day to find out how his daughter is doing. She gets ill very often and then cannot attend kindergarten. Because of that I cannot go to work, and without Andrey we will have no means of supporting ourselves. And we love him very much because he is the best husband and dad. And it is impossible to express in words how much we miss him and how much we want to see him as soon as possible.

 Your Honor, when I was informed about Andrei's arrest, for me it was the greatest shock and I still cannot believe that. And I cannot believe that my Andrei voluntarily, of his own accord, could ever break the law.

/the end of page 2, initialed/

Because he is a very positive person. He always empathizes with those, who due to circumstances, ended up in a difficult situation. And he is always ready to help everybody who would ask him about it.

Thank you for taking the time to read this letter.

Respectfully,  Anna Tyurina

/signed/ Tyurina, A.

Достопочтенной Лоре Суэйн

Окружной Судье Соединенных Штатов

Южный Округ Нью- Йорка

Здравствуйте Ваша Честь, меня зовут Тюрина Анна, я являюсь женой Тюрина Андрея. В этом письме я хочу рассказать Вам о моем муже , о нашей семье.

На момент нашего знакомства,мы жили в разных городах,он в Москве,я в Санкт-Петербурге.На выходных Андрей приезжал ко мне,красиво ухаживал,при каждой встрече дарил цветы и подарки.В Петербурге мы много гуляли,посещали Эрмитаж,ездили в Петергоф(Петродворец с фонтами). Мы ездили в путешествие на Кубу,на Байкал,в Крым,все это было до рождения ребенка,в путешествиях Андрей не любит сидеть на месте,мы посещали эксукрсии,где можно узнать исторические факты. В одном из наших путешествий мы узнали,что у нас будет ребенок,в связи с этим,я плохо себя чувствовала,Андрей очень трепетно ко мне относился,выполнял любые мои просьбы,я знала,что он будет замечательным отцом.После известий о беременности мы решили пожениться,мы не планировали пышной свадьбы,хотели сделать садьбу для нас двоих.Купили одиноковые кольца,свадебные костюмы,договорились с фотографом о свадебной фотосессии,но за неделю до назначеной даты,я серьезно заболела и попала в больницу почти на месяц.И тут Андрей меня очень поддерживал,постоянно созванивался с моей мамой,поддерживал ее,чтобы она не волновалась.Приезжал ко мне через весь город,привозил мне личные вещи и разные вкусности,хотя его даже не пускали ко мне. В итоге после всех этих невзогд,мы просто пошли в ЗАГС и и стали мужем и женой,после чего был тихий семейный ужин с родителями. Андрей был счастлив,узнав о беременности,мы вместе выбирали имя для дочери,он был со мной ,когда мы делали 3Д узи.,вместе выбирали кровтку,коляску,ездили в магазин за детской одеждой. Мы решили,что Андрей будет присутсовать на родах,но роды были не естественные(кесарево сечение),это нас не остановило,во время операции Андрей находился в предоперационной,после появления дочери,ему дали ее на руки,и он нес ее в детское отделение,получается,он бы первым,кого отчетливо увидела наша дочь.После он был со мной в палате,пока я отходила от наркоза. Как я и предпологала,он оказался очень хорошим отцом.Первый год мы каждый месяц посещали педиатра,всегда ездили вместе с Андреем.По ночам ,когда ребенок,капризничал и не спал,Андрей носил ее на руках,давая мне отдохнуть.Все трудности,связанные с младенчеством,мы преодолевали

вместе.Когда дочь подросла,Андрей учил ее ходить,много играл с ней в равивающие игры,читал детские книги.Иногда мы семьей выбирались в парк на прогулку,где играли с ребенком в мяч или просто дурачились.Наша дочь заметно подросла за время отсутсвия Андрея,от этого очень грустно,он переживает,что не слышал ее первых отчетливых слов,только

иногда по телефону,не может видеть ,как она научилась бегать,танцевать.И дочь очень скучает по папе,часто спрашивает,когда приедет папа,почему его так долго нет. У Андрея не много друзей,я с некоторыми из них знакома,но близко не общалась,т.к. с маленьким ребенком особо нет свободного времени.Андрей иногда встречался с ними,проводил время. У меня все друзья живут в Петербурге,поэтому мы видимся с ними очень редко,но Андрей никогда не против,если к нам в гости кто то приезжает,с удовольствием с ними общается. С моей мамой у Андрея хорошие и доверительные отношения,мы ездили к ней в гости,Андрей рад ,когда мама приезжает к нам.Когда мы с ребенком ездили к морю,Андрей настоял,чтобы моя и его мама поехали с нами. За время отсутсвия Андрея,в семье его родителей случилось два несчатья,у его отца скоропостижно скончалась сестра,а у его мамы умер брат из-за болезни сердца.Родители Андрея очень подавлены,еще и Андрей в такой сложной ситуации,я их поддерживаю как могу,но это не заменит им поддержку единственного сына. О Андрее я могу сказать,что он человек разносторонний,он много читает,в основном это исторические ,документальные произведения,фантастика.Занимается любительски карате,регулярно посещает тренировки,ведет здоровый образ жизни.Фильмы он тоже смотрит,в основном документальные,историкко-политические, он любит "умное" кино,еще любит кино про "Зомби") Все наши разговоры сей час,в основном о дочери,о ее достижениях и неудачах,я советуюсь с Андреем в вопросах воспитания.Сей час у нашей дочери сложный период,ей сей час три с половиной года,идет становление личности,у нее проблемы в общении со сверстниками,мы работаем с психологом,и как говорит психолог,одна из причин,что папа далеко.Андрей очень переживает,по возможности,звонит два раза в день,чтобы узнать,как дочь.Она очень часто болеет,и не может постоянно посещать детский сад,в связи с этим я не могу пойти на работу,и без Андрея мы останемся без средств к существованию.И мы его очень любим,он наш самый лучший муж и папа. И не возможно выразить словами,как мы скучаем по нему,и как хотим его скорее увидеть.

Ваше Честь,когда мне сообщили об аресте Андрея,для меня это было величайшим потрясение,я не могу до сих пор в это поверить. И я не могу поверить,что мой Андрей по собственной воле мог ,когда либо, нарушить закон.

Ведь он настолько положительный человек,он всегда сопереживает всем,кто по какой то причине ,оказался в тяжелой жизненной ситуации. И он всегда готов прийти на помощь всем,кто бы

Благодарю Вас,что нашли время прочесть это письмо.

С уважением, Тюрина Анна.

EXHIBIT E

⌈redacted⌉

# EXHIBIT F

Andrew M. Calamari
Sanjay Wadhwa
Michael D. Paley
Paul G. Gizzi
Judith Weinstock
Kristine M. Zaleskas
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office

██████████████

Email: █████████████████

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | **15 Civ. _____ ( ___ )** |
| | : | |
| **JOSHUA SAMUEL AARON, GERY SHALON,** | : | **COMPLAINT** |
| **and ZVI ORENSTEIN,** | : | |
| | : | |
| Defendants. | : | |
| | : | **(ECF CASE)** |
| | : | |

Plaintiff Securities and Exchange Commission (the "Commission"), for its

complaint against defendants Joshua Samuel Aaron ("Aaron"), Gery Shalon ("Shalon"),

and Zvi Orenstein ("Orenstein") (collectively, the "Defendants"), alleges as follows:

## SUMMARY OF ALLEGATIONS

1.     This action concerns the Defendants' roles in multiple "pump-and-dump"

schemes dating back to at least mid-2011. Through their control of numerous

promotional websites and possession of vast email lists, defendants Aaron and Shalon

touted penny stocks in order to unlawfully profit from the short-term increase in the price

and trading volume of each stock caused by their promotional campaign. These promotional campaigns frequently urged people to buy shares of the promoted issuers without properly disclosing that the promoters themselves owned shares of these issuers and, contrary to their exhortations to readers of their emails to buy shares, intended to sell those shares immediately.

2.  During 2011 through 2012, defendants Aaron and Shalon unlawfully promoted, and, with defendant Orenstein, unlawfully schemed to defraud investors in, the stocks of at least the following six microcap issuers: Southern Home Medical Equipment, Inc.; Greenfield Farms Grassfed Beef, Inc.; Next Generation Energy Corporation; Mustang Alliances, Inc.; IDO Security, Inc.; and Premier Brands, Inc.

3.  By engaging in the conduct set forth in this Complaint, (a) defendants Aaron and Shalon violated – and unless permanently enjoined, will continue to violate – Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; (b) defendant Orenstein violated – and unless permanently enjoined, will continue to violate – Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1) and (3)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)]; and (c) each defendant aided and abetted the other defendants' violations.

## NATURE OF THE PROCEEDINGS AND THE RELIEF SOUGHT

4.     The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)].

5.     The Commission seeks a final judgment: (a) permanently enjoining Defendants from committing future violations of the above provisions of the federal securities laws; (b) ordering Defendants to disgorge any ill-gotten gains with prejudgment interest thereon; (c) ordering Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; (d) prohibiting Defendants, pursuant to Section 21(d)(6)(A) of the Exchange Act [15 U.S.C. § 78u(d)(6)(A)] from participating in an offering of penny stock; and (e) ordering such other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over this action pursuant to Sections 20(d)(1) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(d)(1) and 77v(a)] and Section 21(d) and 27 of the Exchange Act, [15 U.S.C. §§ 78u(d) and 78aa]. Venue lies in this district pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa]. A substantial portion of the transactions, acts, practices and courses of business constituting the violations alleged herein occurred within the Southern District of New York.

7.     In connection with the transactions, acts, practices and courses of business alleged in this Complaint, Defendants, directly or indirectly, singly or in concert, have

3

made use of the means and instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange.

## DEFENDANTS

8. **Aaron**, aka Mike Shields, age 31, is an American citizen, and currently resides in Israel.

9. **Shalon**, aka Phillipe Mousset and Christopher Engeham, age 31, is a native of the Republic of Georgia and an Israeli citizen, and currently resides in Israel.

10. **Orenstein**, aka Aviv Stein and John Avery, age 41, is an Israeli citizen, and currently resides in Israel.

## RELEVANT PARTIES

### The Issuers

11. **Southern Home Medical Equipment, Inc. ("SHOM")** is a microcap issuer incorporated in Nevada and headquartered in Greer, South Carolina. It is quoted on OTC Link, operated by OTC Markets Group ("OTC Link"), under the ticker SHOM.

12. **Greenfield Farms Grassfed Beef, Inc. ("GRAS")** is a microcap issuer incorporated in Nevada, and based in West Palm Beach, Florida. It is quoted on OTC Link under the ticker GRAS.

13. **Next Generation Energy Corporation ("NGMC")** is a microcap issuer incorporated in Nevada, and based in Annandale, Virginia. It is quoted on OTC Link under the ticker NGMC.

14. **Mustang Alliances, Inc. ("MSTG")** is a microcap issuer incorporated in Nevada, and based in Miami, Florida. It is quoted on OTC Link under the ticker MSTG.

4

15.    **IDO Security, Inc. ("IDOI")** is a microcap issuer incorporated in Nevada, and based in Miami, Florida. IDOI was formed from a reverse merger of IDO Security Ltd. and a publicly traded shell company in 2004. It is quoted on OTC Link under the ticker IDOI.

16.    **Premier Brands, Inc. ("BRND")** is a microcap issuer incorporated in Wyoming, and headquartered in Bonita, California. It is quoted on OTC Link under the ticker BRND.

## FACTS

### Overview of the Defendants' Schemes

17.    In 2011 and 2012, the Defendants controlled at least twenty stock promotion websites as well as various email address lists. In a typical promotional campaign, the Defendants sent multiple emails touting the same issuer, purporting to come from different, seemingly unrelated sources. Many of these emails urged the recipients to buy shares of the issuers as soon as possible.

18.    Prior to these promotions, however, the Defendants or their associates generally obtained stock in the issuers that they were promoting. At the same time that they were encouraging the email recipients to buy the promoted stocks, the Defendants or their associates sold their shares into the buying activity that they generated.

19.    While the promotional emails contained lengthy disclaimers, these disclaimers did not reveal the promoters' stock ownership or their intention to immediately sell their shares and profit from the increase in price and demand that their touts generated.

20.     The Defendants took elaborate measures to obscure their identities and to conceal their association with the promotional websites and trading activity. They adopted multiple aliases, deployed multiple nominee entities (purportedly based throughout the world), used multiple email addresses, and employed multiple bank and brokerage accounts in the U.S. and abroad.

21.     The Defendants worked in concert to effectuate the scheme. Among other things:

- **Aaron** wrote, created, and helped design the email and website promotions;

- **Shalon** contributed to the email content, sent out the promotional emails, and approved the use of funds by Orenstein to purchase domain names; and

- **Orenstein** handled back-office duties, such as setting up websites, maintaining brokerage accounts using aliases, directing payments to third parties; and often communicating with the financial firms about these accounts on behalf of the Defendants.

22.     In each case, the Defendants' promotional campaign was accompanied by a spate of contemporaneous press releases put out by the issuer, many of which were suspicious in both their timing and content.

23.     In each case, after the Defendants' promotional campaign ceased (and the Defendants and their associates had sold their shares), the stock price and trading volume plummeted, leaving investors with losses and with holdings of relatively illiquid stock.

6

**The SHOM Scheme**

24.    In May 2011, the Defendants engaged in a promotion of SHOM, a penny stock issuer that purported to be a provider of "healthcare services, staffing and durable medical equipment to medical institutions." Aaron and Shalon sent out a series of promotional emails from May 19 through May 25, 2011, from websites and domains they controlled, including pennystockdiscoveries.com and obscurestocks.com.

25.    The emails encouraged readers to buy SHOM shares. The emails touted SHOM as a great investment for long-term growth. Among other things, the emails claimed that investing in SHOM presented "an unprecedented opportunity for you to potentially profit with a company set to capture a sizeable portion of the health care market" and that "trading for just pennies on the dollar, the time is right to buy shares in SHOM."

26.    The disclaimers used by Aaron and Shalon on the promotional materials stated that the promotional websites were subsidiaries of a fictional entity, which had received SHOM shares as payment for the promotions. The disclaimers stated that:

> officers, directors, and employees of the featured company
> or [the fictional entity] and anyone mentioned in this report,
> and members of their families may hold a position and may
> SELL their entire positions or trade in these securities for
> their own accounts including when this report is distributed.
> (Underlining added.)

27.    In fact, the promoters, *i.e.* the Defendants, *intended* to sell their positions as soon as the emails were distributed.

28.    During and immediately following the promotional campaign, the price and trading volume of SHOM shares increased dramatically. On May 20, 2011, the closing share price reached $0.33, an increase of over 1,800% over to the average closing

7

price of $0.017 during the trading days immediately preceding the promotion, and, on May 23, 2011, the trading volume exceeded 30 million shares, compared to the average daily trading volume of approximately 1.2 million shares for the three months immediately preceding the promotion.

29.     The Defendants took advantage of this temporary increase in price and liquidity by selling 15 million shares of SHOM for proceeds of more than $300,000. These shares were sold through an account in the name of Entersa Ltd. (an entity controlled by the Defendants) at Broker A ("Entersa Account A"). Entersa Account A was opened by "Mike Shields," an alias used by Aaron. Entersa Account A account statements were sent to "Christopher Engeham," an alias used by Shalon.

**The GRAS Scheme**

30.     In the summer of 2011, the Defendants participated in a promotion of GRAS, a penny stock issuer that purported to be a "consumer and wholesale driven producer of grassfed beef focused on delivering its product to major retail grocery chains throughout the country."

31.     Beginning around July 12, 2011, defendants Aaron and Shalon, through their websites and domains, including stockcastle.com, wallstreetpennystockadvisors.com, and obscurestocks.com, issued promotional emails touting GRAS, claiming among other things that GRAS "shares are up over 8-fold in the last few months and could easily quadruple again in value in the next six months." The emails encouraged readers to buy GRAS shares. For example, an email from stockcastle.com on July 18, 2011 says:

8

> Now is probably the lowest you will see **GRAS** so you
> should scoop some stock up before another announcement
> sends the price soaring! (Emphasis in original.)

32. Disclaimers used by Aaron and Shalon in the GRAS promotions claimed

that the websites touting GRAS were subsidiaries of another entity (secretly controlled by

the Defendants"), that the entity had been compensated in GRAS shares for the

promotion, and that:

> officers, directors, and employees of the featured company or [a
> fictional entity controlled by the defendants] and anyone
> mentioned in this report, and members of their families may hold a
> position and may SELL their entire positions or trade in these
> securities for their own accounts including when this report is
> distributed. (Underlining added.)

33. In fact, the promoters, *i.e.* the Defendants, *intended* to sell their positions

as soon as the emails were distributed.

34. During and immediately following the promotional campaign, the price

and trading volume of GRAS shares increased dramatically. On July 14, 2011, the

closing share price reached $0.58, an increase of about 286% over to the average closing

price of $0.15 during the trading days immediately preceding the promotions. For the

three-month period prior to the promotion, GRAS was very thinly traded with an average

daily trading volume of approximately 9,700 shares; however, during the promotion

period, the average daily trading volume skyrocketed to over 1.2 million shares.

35. The Defendants took advantage of this temporary increase in price and

liquidity by selling at least 286,000 shares for proceeds of at least $123,000. The

Defendants sold these shares through an account in the name of Entersa at Broker B

("Entersa Account B"). John Avery, an alias of Orenstein, was an authorized signatory

on Entersa Account B.

9

**The NGMC Scheme**

36.     In August 2011, the Defendants conducted a promotion of NGMC, a penny stock issuer that purported to be an "independent oil and natural gas company, engaged in the exploration, development, and production of natural gas properties located onshore in the United States." The promotion was disseminated via emails through websites and domains that the Defendants controlled, including obscurestocks.com, stockcastle.com, and wallstreetpennystockadvisors.com.

37.     These emails touted NGMC's business model and the growing demand for oil in developing markets, and encouraged investors to buy shares in NGMC, touting its "enormous profit potential." An August 12, 2011 email stated "We think now is a good time to invest in NGMC."

38.     Similar to the SHOM and GRAS promotional materials, the disclaimers on the NGMC promotional materials claimed that their websites and domains were wholly-owned subsidiaries of a fictional entity, and that the entity had received shares of NGMC as compensation for sending the newsletter.

39.     These disclaimers, as with those used in the SHOM and GRAS promotions, claimed that the fictional entity "and anyone mentioned in this report, and members of their families may hold a position and may SELL their entire positions or trade in these securities for their own accounts including when this report is distributed." (Underlining added.)

40.     In fact, the promoters, *i.e.* the Defendants, *intended* to sell their positions as soon as the emails were distributed.

41.     During and immediately following the promotional campaign, the price

10

and trading volume of NGMC shares increased dramatically. On August 15, 2011, the closing share price reached $0.43, an increase of about 93% over to the average closing price of $0.222 during the trading days immediately preceding the promotions. During the three months preceding the promotion, the average daily trading volume was approximately 23,000 shares; however, during the promotion period, the average daily trading volume increased more than ten-fold to more than 240,000 shares.

42.     The Defendants took advantage of this temporary increase in price and liquidity by selling at least 93,000 shares of NGMC for proceeds of more than $36,000. Prior to these sales, Aaron emailed Orenstein in connection with the acquisition of NGMC shares and asked Orenstein to look into the status of these shares.

**The MSTG Scheme**

43.     In early 2012, the Defendants conducted a promotion of the stock of MSTG, a penny stock issuer that purported to be a mining company focused on the exploration, development, and operation of gold mines in Honduras.

44.     Aaron and Shalon disseminated multiple promotional emails through websites and domains that they controlled, including stockcastle.com and WallStreetPennyStockAdvisors. The promotions claimed, among other things, that MSTG had purchased mining equipment expected to support 1,000 ounces of gold a month, and that "Mustang is sitting on at least $1.7 billion worth of gold, plus potentially hundreds and millions worth of silver."

45.     The promotions contained a disclaimer that the website, through its parent company (a fictional entity) had received cash from another entity (secretly controlled by the Defendants) in compensation for the promotions. This disclaimer misleadingly failed

11

to disclose that while promoting MSTG, the Defendants actually were selling MSTG stock from accounts that they controlled and were benefitting from the rise in stock price resulting from their promotional activity.

46.     During and immediately following the promotional campaign, the price and trading volume of MSTG shares increased dramatically. On February 26, 2012, the closing share price reached $1.45, an increase of about 65% over to the average closing price of $0.88 during the trading days immediately preceding the promotions. During the three-month period preceding the promotion, the average daily trading volume was approximately 35,000 shares; however, during the promotional period, the average daily trading volume increased more than twenty-fold to more than 750,000 shares.

47.     The Defendants took advantage of this temporary increase in price and liquidity by depositing 2.5 million shares in an account at Broker B, and selling at least 1.9 million shares during the promotion for proceeds of over $2.2 million.

**The IDOI Scheme**

48.     In July and August, 2012, the Defendants participated in a promotion of IDOI, a penny stock issuer that purported to be engaged "in the design, development and marketing of shoe scanning device[s] for the homeland security and loss prevention markets."

49.     Aaron and Shalon disseminated promotional emails through many of their websites and domains, including ultimatepennystocks.com and UpcomingPennyStocks.com. Their promotions claimed, among other things, that "IDOI could turn every $5000 invested today into $55,000 very quickly and potentially more than $250,000 in two years." The emails encouraged readers to purchase shares of IDOI,

12

including statements like "Call your broker today. Whatever you do, don't miss out" and "IDOI could potentially jump to $5.00 as IDOI keeps expanding worldwide and perhaps next year into an airport near you."

50.     As in their MSTG promotional materials, the promotions contained a disclaimer that the website, through its parent company (a fictional entity) had received cash from another entity (secretly controlled by the Defendants) in compensation for the promotions.

51.     This disclaimer misleadingly failed to disclose that while promoting IDOI, an associate of the Defendants actually was selling hundreds of thousands of shares of IDOI stock with proceeds in the hundreds of thousands of dollars, and was sharing the profits from the scheme with the Defendants.

52.     During and immediately following the promotional campaign, the price and trading volume of IDOI shares increased dramatically. On July 23, 2012, the closing share price reached $0.72, an increase of about 112% over to the average closing price of $0.339 during the trading days immediately preceding the promotions. During the three-month period preceding the promotion, the average daily trading volume was approximately 102,000 shares; however, during the promotional period, the average daily trading volume increased more than ten-fold to more than 1.2 million shares.

53.     A fund controlled by an associate of the Defendants benefitted from the temporary increase in price in liquidity and sold at least 900,000 share of IDOI netting at least $580,000, a portion of which was shared with the Defendants.

**The BRND Scheme**

54.     In October 2012, Defendants participated in a scheme to manipulate the price of BRND, a purported consumer goods incubator in the business of creating, acquiring and marketing consumer packaged goods, primarily beverages and nutritional supplements, and selling them into supermarkets, pharmacies and convenience stores.

55.     In mid-October 2012, the Aaron and Shalon issued promotional emails from several of their websites and domains, including hottestpennystocks.com, stockcastle.com, obscurestocks.com, and wallstreetpennystockadvisors.com, proclaiming, among other things, that "Premier Brands works the red-hot $100 billion energy drink market – and Wall Street." Another email claimed that "people who act early on BRND will get ten times, if not 100 times returned in long term profits."

56.     As in their MSTG and IDOI promotional materials, the Defendants' promotions contained a disclaimer that the website, through its parent company (a fictional entity) had received cash from another entity, in this case Realto Investments Ltd, in compensation for the promotions. Prior to the promotion, Aaron emailed Orenstein about the name of an entity to use in connection with the promotion, and Orenstein replied "Realto Investments."

57.     The disclaimer misleadingly failed to disclose that, while promoting BRND, the Defendants actually were selling BRND stock from an account that they controlled and were benefitting from the rise in stock price resulting from their promotional activity.

58.     During and immediately following the promotional campaign, the price and trading volume of BRND shares increased dramatically. On October 19, 2012, the

14

closing share price reached $0.825, an increase of about 41% over to the average closing price of $0.586 during the trading days immediately preceding the promotions. During the three-month period preceding the promotion, the average daily trading volume was roughly 87,000 shares; however, during the promotional period, the average daily trading volume increased more than five-fold to more than 480,000 shares.

59.     The Defendants took advantage of this temporary increase in price and liquidity by selling at least 275,000 shares of BRND through an account they secretly controlled, for profits of at least $216,000.

## FIRST CLAIM FOR RELIEF

### Violations of Section 17(a)(2) of the Securities Act
### (Aaron and Shalon)

60.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 59.

61.     Defendants Aaron and Shalon, in the offer or sale of securities, by the use of means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly obtained money or property by means of an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

62.     By reason of the conduct described above, Defendants Aaron and Shalon, and Orenstein, directly or indirectly, violated, and, unless enjoined, will again violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

15

## SECOND CLAIM FOR RELIEF

### Violations of Sections 17(a)(1) and 17(a)(3) of the Securities Act
### (All Defendants)

63.     The Commission realleges and incorporates by reference herein each and
every allegation contained in paragraphs 1 through 59.

64.     Defendants Aaron, Shalon and Orenstein, in the offer or sale of securities,
by the use of means or instruments of transportation or communication in interstate
commerce or by the use of the mails, directly or indirectly: employed devices, schemes or
artifices to defraud; and engaged in transactions, practices or courses of business which
operate or would operate as a fraud or deceit upon a purchaser.

65.     By reason of the conduct described above, Defendants Aaron, Shalon, and
Orenstein, directly or indirectly, violated, and, unless enjoined, will again violate, Section
17(a) of the Securities Act [15 U.S.C. § 77q(a)].

### THIRD CLAIM FOR RELIEF

### Violations of Section 10(b) of the
### Exchange Act and Rule 10b-5(b)
### (Aaron and Shalon)

66.     The Commission realleges and incorporates by reference herein each and
every allegation contained in paragraphs 1 through 59.

67.     Defendants Aaron and Shalon, directly or indirectly, singly or in concert,
knowingly or recklessly, by the use of the means or instrumentalities of interstate
commerce or of the mails, or of the facilities of a national securities exchange, in
connection with the purchase or sale of securities, knowingly or recklessly, made untrue
statements of material fact and have omitted to state material facts necessary in order to

16

make the statements made, in the light of the circumstances under which they were made, not misleading.

68.      By reason of the foregoing, Defendants Aaron, Shalon and Orenstein, singly or in concert, directly or indirectly, violated and, unless enjoined, will again violate, Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## FOURTH CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and 10b-5(c) (All Defendants)

69.      The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 59.

70.      Defendants Aaron, Shalon and Orenstein, directly or indirectly, singly or in concert, knowingly or recklessly, by the use of the means or instrumentalities of interstate commerce or of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of securities, knowingly or recklessly, have employed devices, schemes and artifices to defraud, and engaged in acts, practices and courses of business which operated or would have operated as a fraud or deceit upon purchases of securities or upon other persons.

71.      By reason of the foregoing, Defendants Aaron, Shalon and Orenstein, singly or in concert, directly or indirectly, violated and, unless enjoined, will again violate, Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

17

## FIFTH CLAIM FOR RELIEF

### Aiding and Abetting Violations of
### Exchange Act Section 10(b) and Rule 10b-5 and Securities Act Section 17(a)
### (All Defendants)

72.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 59.

73.     Aaron, Shalon and Orenstein knowingly or recklessly provided substantial assistance to each other in the commission of the forgoing violations.

74.     By reason of the foregoing, Defendants, singly or in concert, directly or indirectly, violated and, unless enjoined, will again violate, Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)], Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] and Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests a Final Judgment:

A.     Permanently enjoining Defendants from violating, directly or indirectly, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], and  Section 10(b) the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5  [17 C.F.R. § 240.10b-5] thereunder

B.     Ordering Defendants to disgorge all ill-gotten gains that they obtained as a result of the conduct, acts or courses of conduct described in this Complaint, and to pay prejudgment interest thereon;

C.     Ordering Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act 15 U.S.C. § 77t(d)]  Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

D.     Prohibiting Defendants, pursuant to Section 21(d)(6)(A) of the Exchange Act [15 U.S.C. § 78u(d)(6)(A)] from participating in an offering of penny stock; and

18

E.     Granting such other and further relief as the Court may deem just and

proper.


Dated:     New York, New York
           July 21, 2015


                                    Respectfully submitted,


                                    *Sanjay Wadhwa*
                                    Sanjay Wadhwa
                                    Senior Associate Regional Director

                                    Andrew M. Calamari
                                    Michael D. Paley
                                    Paul G. Gizzi
                                    Judith Weinstock
                                    Kristine M. Zaleskas
                                    Attorneys for Plaintiff
                                    SECURITIES AND EXCHANGE
                                       COMMISSION
                                    New York Regional Office

EXHIBIT G

8-K 1 d799478d8k.htm FORM 8-K

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C. 20549**

---

# FORM 8-K

---

### CURRENT REPORT

**Pursuant to Section 13 or 15(d)**
**of the Securities Exchange Act of 1934**

**Date of Report (date of earliest event reported): October 2, 2014**

---

# JPMorgan Chase & Co.

**(Exact name of registrant as specified in its charter)**

---

| | | |
|---|---|---|
| **Delaware** | **1-5805** | **13-2624428** |
| **(State or other jurisdiction of incorporation or organization)** | **(Commission File Number)** | **(I.R.S. employer identification no.)** |

| | |
|---|---|
| **270 Park Avenue, New York, New York** | **10017** |
| **(Address of principal executive offices)** | **(Zip Code)** |

**Registrant's telephone number, including area code: (212) 270-6000**

---

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ **Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)**

☐ **Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)**

☐ **Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))**

☐ **Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))**

**Item 7.01    Regulation FD Disclosure.**

On October 2, 2014, JPMorgan Chase & Co. ("JPMorgan Chase" or the "Firm") updated information for its customers, on its Chase.com and JPMorganOnline websites and on the Chase and J.P. Morgan mobile applications, about the previously disclosed cyberattack against the Firm. The Firm disclosed that:

- User contact information – name, address, phone number and email address – and internal JPMorgan Chase information relating to such users have been compromised.

- The compromised data impacts approximately 76 million households and 7 million small businesses.

- However, there is no evidence that account information for such affected customers – account numbers, passwords, user IDs, dates of birth or Social Security numbers – was compromised during this attack.

- As of such date, the Firm continues not to have seen any unusual customer fraud related to this incident.

- JPMorgan Chase customers are not liable for unauthorized transactions on their account that they promptly alert the Firm to.

The Firm continues to vigilantly monitor the situation and is continuing to investigate the matter. In addition, the Firm is fully cooperating with government agencies in connection with their investigations.

*This Current Report on Form 8-K contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. These statements are based on the current beliefs and expectations of JPMorgan Chase & Co.'s management and are subject to significant risks and uncertainties. Actual results may differ from those set forth in the forward-looking statements. Factors that could cause JPMorgan Chase and Co.'s actual results to differ materially from those described in the forward-looking statements can be found in JPMorgan Chase & Co.'s Annual Report on Form 10-K for the year ended December 31, 2013, and Quarterly Reports on Form 10-Q for the quarters ended March 31, 2014 and June 30, 2014, which have been filed with the Securities and Exchange Commission and are available on JPMorgan Chase's website ( http://investor.shareholder.com/jpmorganchase ) and on the Securities and Exchange Commission's website ( www.sec.gov ). JPMorgan Chase & Co. does not undertake to update the forward-looking statements to reflect the impact of circumstances or events that may arise after the date of the forward-looking statements.*

2

SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

JPMorgan Chase & Co.

(Registrant)

By:     /s/ Neila B. Radin

Neila B. Radin
Senior Vice President

Dated: October 2, 2014

3

# EXHIBIT H



An official website of the United States government
**Here's how you know**

THE UNITED STATES
DEPARTMENT *of* JUSTICE
STICE NEWS

**Department of Justice**

Office of Public Affairs

FOR IMMEDIATE RELEASE                                                 Thursday, February 15, 2018

# Two Russian Nationals Sentenced to Prison for Massive Data Breach Conspiracy

### Hackers Targeted Major Payment Processors, Retailers and Financial Institutions Around the World

Two Russian nationals were sentenced yesterday to federal prison terms for their respective roles in a worldwide hacking and data breach scheme that targeted major corporate networks, compromised 160 million credit card numbers and resulted in hundreds of millions of dollars in losses – one of the largest such schemes ever prosecuted in the United States.

The sentences were announced by Acting Assistant Attorney General John P. Cronan of the Justice Department's Criminal Division, First Assistant U.S. Attorney William E. Fitzpatrick of the District of New Jersey and Director Randolph D. Alles of the U.S. Secret Service.

Vladimir Drinkman, 37, of Syktyvkar and Moscow, Russia, was sentenced to 144 months in prison. Drinkman previously pleaded guilty before U.S. District Judge Jerome B. Simandle of the District of New Jersey to one count of conspiracy to commit unauthorized access of protected computers and one count of conspiracy to commit wire fraud in a manner affecting a financial institution. Dmitriy Smilianets, 34, of Moscow, previously pleaded guilty to conspiracy to commit wire fraud in a manner affecting a financial institution and was sentenced to 51 months and 21 days in prison. Both men pleaded guilty in September 2015 before Judge Simandle, who imposed the sentences yesterday in Camden, New Jersey federal court. In addition to the prison terms, Judge Simandle sentenced Drinkman to three years of supervised release and Smilianets to five years of supervised release.

Drinkman and Smilianets were arrested in the Netherlands on June 28, 2012. Drinkman was extradited to the District of New Jersey on Feb. 17, 2015, and Smilianets was extradited on Sept. 7, 2012.

"Drinkman and Smilianets not only stole over 160 million credit card numbers from credit card processors, banks, retailers, and other corporate victims, they also used their bounty to fuel a robust underground market for hacked information," said Acting Assistant Attorney General Cronan. "While mega breaches like these continue to affect millions of individuals around the world, hackers and would-be hackers should know that the Department of Justice will use all available tools to identify, arrest, and prosecute anyone who attacks the networks on which businesses and their customers rely."

"These defendants operated at the highest levels of illegal hacking and trafficking of stolen identities," First Assistant U.S. Attorney Fitzpatrick. "They used their sophisticated computer skills to infiltrate computer networks, steal information and sell it for a profit. Perpetrators of some of the largest data breaches in history, these defendants posed a real threat to our economy, privacy and national security, and cannot be tolerated."

"This case demonstrates the investigative capabilities of the U.S. Secret Service and the collaborative efforts of our law enforcement partners, specifically the U.S. Attorney's Office for the District of New Jersey, and the Dutch Ministry of Security and Justice," Special Agent in Charge McKevitt said. "The Secret Service will continue to develop innovative

Case 1:15-cr-00033-LTS Document 155-1 Filed 11/05/20 Page 47 of 48

ways to protect the financial infrastructure of the United States and bring to justice cyber criminals who use emerging technologies to conduct business."

According to documents filed in this case and statements made in court:

Drinkman and Smilianets admitted to their roles in a conspiracy with three co-defendants to hack into the networks of corporate victims engaged in financial transactions, retailers that received and transmitted financial data and other institutions with information that the conspirators could exploit for profit, including the computer networks of NASDAQ, 7-Eleven, Carrefour, JCP, Hannaford, Heartland, Wet Seal, Commidea, Dexia, JetBlue, Dow Jones, Euronet, Visa Jordan, Global Payment, Diners Singapore and Ingenicard.

According to the indictment in this case and statements made in court, the five defendants each played specific roles in the scheme. Drinkman and Alexandr Kalinin, 31, of St. Petersburg, Russia, allegedly specialized in penetrating network security and gaining access to the corporate victims' systems. Drinkman and Roman Kotov, 36, of Moscow, allegedly specialized in mining the networks to steal valuable data. The hackers hid their activities using anonymous web-hosting services allegedly provided by Mikhail Rytikov, 30, of Odessa, Ukraine. Smilianets sold the information stolen by the other conspirators and distributed the proceeds of the scheme to the participants.

Drinkman and Kalinin were previously charged in New Jersey as "Hacker 2" and "Hacker 1" in a 2009 indictment charging Albert Gonzalez, 34, of Miami, Florida, in connection with five corporate data breaches – including the breach of Heartland Payment Systems Inc., which at the time was the largest ever reported. Gonzalez is currently serving 20 years in federal prison for those offenses. Kalinin is also charged in two federal indictments in the Southern District of New York: the first charges Kalinin in connection with hacking certain computer servers used by NASDAQ and the second charges him and another Russian hacker, Nikolay Nasenkov, with an international scheme to steal bank account information from U.S.-based financial institutions. Rytikov was previously charged in the Eastern District of Virginia with an unrelated scheme.

Kalinin, Kotov and Rytikov remain at large.

**The Attacks**

According to documents filed in this case and statements made in court, the five defendants allegedly penetrated the computer networks of corporate victims and stole user names and passwords, means of identification, credit and debit card numbers and other corresponding personal identification information of cardholders, acquiring more than 160 million card numbers through hacking.

The initial entry was often gained using a "SQL injection attack." SQL, or Structured Query Language, is a type of programing language designed to manage data held in particular types of databases; the hackers allegedly identified vulnerabilities in SQL databases and used those vulnerabilities to infiltrate a computer network. Once the network was infiltrated, the defendants allegedly placed malicious code, or malware, in the system. This malware created a "back door," leaving the system vulnerable and helping the defendants maintain access to the network. In some cases, the defendants lost access to the system due to companies' security efforts, but were allegedly able to regain access through persistent attacks.

Instant message chats obtained by law enforcement revealed the defendants allegedly often targeted the victim companies for many months, waiting patiently as their efforts to bypass security were underway. The defendants had malware implanted in multiple companies' servers for more than a year.
The defendants allegedly used their access to the networks to install "sniffers," which were programs designed to identify, collect and steal data from the victims' computer networks. The defendants then allegedly used an array of computers located around the world to store the stolen data and ultimately sell it to others.

**Selling the Data**

According to documents filed in this case and statements made in court, after acquiring the card numbers and associated data – which they referred to as "dumps" – the conspirators sold it to resellers around the world. The buyers then sold the dumps through online forums or directly to individuals and organizations. Smilianets was in charge of sales, selling the data only to trusted identity theft wholesalers. He charged approximately $10 for each stolen American

credit card number and associated data, approximately $50 for each European credit card number and associated data and approximately $15 for each Canadian credit card number and associated data – offering discounted pricing to bulk and repeat customers. Ultimately, the end users encoded each dump onto the magnetic strip of a blank plastic card and cashed out the value of the dump by withdrawing money from ATMs or making purchases with the cards.

### Covering Their Tracks

According to documents filed in the case and statements made in court, the defendants allegedly used a number of methods to conceal the scheme. Unlike traditional Internet service providers, Rytikov allowed his clients to hack with the knowledge he would never keep records of their online activities or share information with law enforcement.

Over the course of the conspiracy, the defendants allegedly communicated through private and encrypted communications channels to avoid detection. Fearing law enforcement would intercept even those communications, some of the conspirators attempted to meet in person.

To protect against detection by the victim companies, the defendants allegedly altered the settings on victim company networks to disable security mechanisms from logging their actions. The defendants also worked to evade existing protections by security software.

As a result of the scheme, financial institutions, credit card companies and consumers suffered hundreds of millions in losses – including more than $300 million in losses reported by just three of the corporate victims – and immeasurable losses to the identity theft victims in costs associated with stolen identities and false charges. The charges and allegations contained in indictments against the remaining defendants are merely accusations and the defendants are presumed innocent until proven guilty beyond a reasonable doubt in a court of law.

The case was investigated by special agents of the U.S. Secret Service, Newark Field Office and Criminal Investigative Division. The case is being prosecuted by by Trial Attorneys Andrew S. Pak and Richard Green and Deputy Chief of Litigation James Silver of the Criminal Division's Computer Crime and Intellectual Property Section, and Assistant U.S. Attorney Justin Herring of the Computer Hacking and Intellectual Property Section of the Economic Crimes Unit and the Justice Department's Office of International Affairs.  The Criminal Division's Office of International Affairs also provided substantial assistance in this case.

Acting Assistant Attorney General John P. Cronan and U.S. Attorney Carpenito thanked public prosecutors with the Dutch Ministry of Security and Justice and the National High Tech Crime Unit of the Dutch National Police.  They also credited the special agents of the U.S. Secret Service, Newark Field Office, under the direction of Special Agent in Charge Mark McKevitt, and the Criminal Investigative Division, under the direction of Special Agent in Charge Michael D'Ambrosio, for the ongoing investigation leading to yesterday's sentencings.

**Topic(s):**
Cyber Crime

**Component(s):**
Criminal Division
USAO - New Jersey

**Press Release Number:**
18-187

*Updated February 15, 2018*